[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. THE DISSOLUTION OF THE MARRIAGE
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage of the parties has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II THE CONSIDERATION OF DEFENDANT'S INHERITANCES
In 1985 defendant received the sum of $5000 from the estate of his grandfather, Richard H. Jackson.
In 1987 defendant received between $77,000 and $80,000 from the estate of his father, Richard H. Jackson, Jr. together with an additional $8345 in 1988 resulting from the ancillary administration of his father's estate in Florida.
All of the money, exceeding $90,000, was subsequently spent for family purposes.
Defendant proposes that this Court factor his inheritances into the decision by issuing one of the CT Page 8116 following orders:
a) No alimony to plaintiff.
 b) By awarding plaintiff no interest in defendant's incentive savings plan ($124,000)
 c) By transferring to defendant all of plaintiff's equity in the family home without payment of $66,576 (the estimated value of her 1/2 interest) defendant to retain all other assets on his financial affidavit (about $131,000).
In this regard the Court notes that the funds were received by defendant during the course of his marriage, that they were expended for worthy and commendable family purposes — more particularly for additions to the family home, family vacations, and the college education of their daughter Heather — and lastly that none of the funds presently exist.
It is found on the evidence that defendant's expenditure of his inheritance constituted a gift or contribution to the marital estate of his own funds obtained from other than employment and as such should be given due consideration under that portion of Sec. 46b-81c C.G.S. which concerns "the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates" when the marital estate is distributed. Defendant's various proposals, after receiving due consideration, are as a consequence rejected.
III THE MARITAL ASSETS OF THE PARTIER
Plaintiff
 35 Stillmeadow Lane F.M.V. $ 180,500 Somers, CT — MTG. 37,917 --------- Total Equity $ 142,583
1/2 interest 71,292
1990 Honda Accord 1/2 interest 4,875 CT Page 8117 1983 Honda Accord — To daughter — 1991 Honda Accord — leased — — Household Furniture — Fleet Savings Account 193 C.S.E. credit union 1/2 24 Savings Bank of Rockville 1/2 84 Life Insurance C.S.V. 1,994 I.R.A. 3,000 1992/93 I.R.S. refunds 1/2 3,750 ------ Total $ 85,212
Defendant
1/2 interest in family home — see above $ 71,291 1990 Honda Accord — 1/2 4,875 1983 Honda Accord — to daughter — 1978 Honda Accord — 1991 Honda Accord — leased — 1986 Chev. Truck 4,200 Baseball cards, cameras, coins, etc. 11,000 Household furniture — Savings Bank of Rockville, checking account 130 Savings Bank of Rockville, Savings account 1/2 84 C.G.S. Credit Union 1/2 24 Stock 3,528 Life Insurance C.S.V. 6,041 Incentive Savings Plan — Aetna 124,000 I.R.A. Aetna 7,526 Group Life Insurance C.S.V. 4,205 1992/93 I.R.S. refunds 1/2 3,750 Aetna severance or back pay — see later order — -------- Total $240,654
Total Marital Estate $325,866
IV A REVIEW OF THE EVIDENCE IN ACCORDANCE WITH THE PROVISIONS OF SEC. 46b-81c C.G.S.
The plaintiff wife, who is 53 years of age, and the defendant husband, who is 56, were married on January 13, 1962, thirty-two years ago. They have one child, a daughter Heather, 21 years old, who is a senior at Central Connecticut State College. Neither party entered the CT Page 8118 marriage with any pre-marital assets of consequence.
The parties first met in 1960 at the Aetna Life Insurance Company in Hartford, Connecticut where they were both employed. After completing her secondary education plaintiff had worked at Aetna for five years prior to the marriage. Defendant had previously graduated from high school and had served in the United States Marines where he learned basic photography. Following their marriage the parties lived for a while in Enfield and for the last several years have resided in Somers where they own their home.
In the early years of their marriage plaintiff experienced great difficulty with a number of pregnancies. She had her first miscarriage in 1962. In 1972 there followed a still-born daughter after numerous physical problems during the pregnancy. Shortly before Heather was born in 1973 plaintiff ended her employment at Aetna, never to return. Plaintiff had other miscarriages in 1974 and 1975. A tubal ligation in 1983 ended her problems in this field. Concerning her present health, plaintiff has been diagnosed by a chiropractor as suffering from carpal-tunnel syndrome in her left arm. Surgery has not been recommended. Her problems with Graves' disease are presently in remission. She is presently in counselling with a Dr. Barnes for her marital problems.
Defendant has suffered from diabetes for several years. This illness has affected his feet but is controlled by oral medication.
Employment History of the Parties
Plaintiff
After terminating her employment at Aetna in 1973 when her daughter was born, plaintiff was fully occupied as a housewife and mother until 1984 when her involvement in local politics along with her husband led to her obtaining a part time position in the Connecticut legislature. In 1986 in addition she began a course of study at a massage therapy school in Amherst, Massachusetts from which she graduated in 1987. She is presently licensed in Connecticut to perform this type of work. CT Page 8119
Plaintiff ended her legislative employment in 1990, arguably at defendant's request, but has continued her interest and employment in the field of massage. She presently rents space in the office of a local chiropractor and from there conducts her business by appointment. Her current financial affidavit indicates a gross weekly income of $180 and a weekly net of $168 after various business expenses and the usual deductions. Plaintiff has stated that her present income is based on treating an average of four persons a week and that she felt she could see more patients per day. She also testified that her physical problems with her hand made it difficult at times for her to perform her work. A secretary at plaintiff's place of employment, who schedules her appointments, noted a recent slight improvement in her practice.
Defendant:
Defendant was employed at Aetna for thirty-six years, ending in 1993 following a general down-sizing of the workplace. For the three years preceding his discharge defendant's job title was director, corporate communications. In this capacity he was responsible for all the tele-conferencing of company meetings in the United States and foreign countries. His work day began at 7:15 AM, ended after 5 PM and involved much traveling. employment record over the years at Aetna was outstanding. In 1992 his gross earnings were $93,208 and in 1993, the year his employment ended, they were $83,000. He also received several bonuses over the years.
Since his discharge defendant, because of his age and the nature of his employment skills, quite understandably has found it difficult to locate work elsewhere: He has made use of the Aetna placement bureau, but because of the surplus of employees in his field, many much younger, he has thus far been unsuccessful in his efforts. He has had one speaking engagement, arranged by his daughter at her college, photographs an occasional wedding and during the summer months sells baseball cards and similar items at fleamarkets in the area.
His current financial affidavit indicates a gross weekly income from his pension of $676 with a weekly net CT Page 8120 income of $480 after the usual deductions.
Fault
The ascertainment of responsibility for the breakdown of this marriage of 32 years will be aided by a review and summary of the testimony of the parties.
Plaintiff:
In plaintiff's view the marital storm clouds began together a week before the marriage when, with stars in her eyes and not a penny in her pocket plaintiff together with her mother accompanied defendant to the office of the town clerk as part of the ritual in obtaining a marriage license. In response to the clerk's request for the $2 fee defendant withdrew a dollar bill from his wallet, placed it on the counter and declared that was his half of the fee, refusing plaintiff's request that he advance her the balance. The dilemma was solved, the transaction was completed, the license was obtained and the day was saved when plaintiff's mother, an uneasy witness to this normally happy event, managed to produce a dollar on her daughter's behalf. In plaintiff's eyes everything was downhill from there on.
A litany of plaintiff's complaints follows: "I had no allowance. I had to go to him for all my checks. In 1979 he accused me of having an affair. I've never been unfaithful to him. He called me a whore, a dyke, a lesbian a boozer, a gad-about. When I began my massage practice he told our friends that I had the image of a prostitute, which embarrassed him. If I tried to discuss our finances with him he'd say it wasn't any of my business or he didn't know."
In referring to the later years of their marriage plaintiff stated "There was no longer a partnership. I tried everything I could to make the marriage work. He wouldn't consider remediation."
At times throughout the marriage plaintiff underwent counselling. She attended four or five sessions with a Dr. Hodge in 1981 for problems related to sex and finances and again in 1984 with a Dr. Breyer for issues related to a CT Page 8121 lack of communication with defendant. As indicated earlier she is presently counselling with a Dr. Barnes.
Defendant:
In his testimony defendant frankly admitted calling plaintiff vile names and that some of the responsibility for the marital breakdown was his. He summarized the marital problems of the parties in stating that there was no communication, no cooperation, no compassion. He felt that the lack of sex and plaintiff's developing new lifestyle drove the parties apart.
Defendant related that in 1973 plaintiff became interested in a group known as the Association for Research and Enlightment and that she attended association functions in Egypt and Israel while defendant remained home caring for their very young daughter. Other association related trips followed in various states as well as to the Philippines. Defendant added that plaintiff developed an interest in reincarnation and when returning from an association meeting in Virginia in the late 1970's informed him that she would no longer participate in sex with him because of a prior misdeed of his in a former life which she had discovered through meditation. While this metaphysical transgression was soon forgiven, the sexual activities of the parties became less frequent until finally in 1986 they ceased completely.
Plaintiff had indicated that defendant's priorities were (1) his job (2) his politics (3) his family. Defendant's response was "my priority is my daughter".
After reviewing all of the evidence on this factor, some of which has been set forth above, this court considers that the parties share equal responsibility for the irretrievable breakdown of their marriage.
Conclusion:
This court has sifted through and weighed all the evidence as it relates to the provisions of § 46b-81c C.G.S. It has particularly considered such predominating factors as the length of the marriage, the health of the parties, their opportunities for the future acquisition of capital CT Page 8122 assets and income and the contributions of each of them to the acquisition, preservation or appreciation in value of the marital estate. It concludes that said estate should be distributed as follows:
Plaintiff 50 per cent
Defendant 50 per cent
V. The Distribution of the Marital Estate
A. The Family Home
1. Plaintiff shall convey to defendant her one half interest to said premises upon receipt by her from defendant of the sum of $66,576, arrived upon as follows:
 Fair Market Value as reflected in $180,500 a sales agreement Plaintiff's Ex. B.
* Less the following deductions:
 First Mortgage $37,917. Conveyance Tax-Town 198.55 Conveyance Tax-State 902.50 Real Estate Commission 8,330. less $1500 ---------- — $ 47,348.05 — $ 47,348.05
Net Proceeds $133,151.95
 Amount due plaintiff $ 66,576.00
2. The defendant will hold the plaintiff harmless with regard to all incumbrances on said premises.
3. The parties shall execute all documents necessary to carry out this order as well as other orders of this CT Page 8123 court.
4. Said sum of $66,576 shall be paid by defendant to plaintiff within sixty days from date hereof.
5. If the defendant fails to buy plaintiff the sum of $66,576 within 60 days from date hereof, then the family home shall be immediately listed for sale at a price and with a real estate agent agreed upon by the parties. The net proceeds of the ultimate sale of the premises, after deducting the usual closing costs, shall be equally divided between the parties.
B. The Balance of the Marital Estate
Total $183,283.
1. The following personal property is assigned to plaintiff.
50% = $91,642
 1991 Honda Accord — leased — Household furniture as agreed upon — Fleet Savings Account 193 C.S.E. Credit Union 48 Savings Bank of Rockville 168 Life Insurance C.S.V. 1994 I.R.A. 3000 I.R.S. refund 1/2 3750 1/2 of defendant's I.S.P. Total 62,000
 50% of stock 50% of cash
 Amount due from defendant 20,489 ------ $91,642
2. The following property is assigned to defendant.
50% = $91,641
 1990 Honda Accord $ 9,750. 1978 Honda Accord — 1986 Chevrolet Truck 4,200 Baseball Cards, cameras, coins etc. 11,000 Household furniture as agreed upon — Savings Bank of Rockville Checking account 130 Stock 3,528 Life Insurance C.S.V. 6,041 1/2 of ISP (see above) 62,000 I.R.A. — Aetna 7,526 Group Life Insurance C.S.V 4,205 I.R.S. refunds 1/2 3,750 ------- Total $112,130
CT Page 8124
 Less Amount due Plaintiff — 20,489 -------- Total due defendant $ 91,641
3. Said sum of $20,489 shall be paid to plaintiff within 60 days from date hereof.
4. Any additional severance pay acquired by defendant and not listed on his current financial affidavit shall be equally divided between the parties, each party being solely responsible for any income tax due on his or her share.
5. The parties have agreed that a 1983 Honda owned jointly by them shall be transferred to their daughter Heather and this provision is incorporated into the orders of this court.
6. The parties have also agreed that the family dog shall remain with defendant and this agreement is also incorporated into the orders of this Court.
VI. Alimony
The Court has considered all of the provisions of § 46b-82 C.G.S. as they apply to the evidence. In particular it has noted the length of the marriage — 32 years, the variation in the present incomes of the parties, their health, vocational skills and employability. Further, the Court has noted plaintiff's testimony that she "could work more per day" in her massage practice. CT Page 8125
On the evidence it is ordered that defendant pay to plaintiff as alimony the sum of $152 per week.
Said order is modifiable only as to amount but shall sooner terminate after the remarriage of the plaintiff, the death of either party, or plaintiff's cohabitation with an unrelated male within the meaning of the statute.
In this regard, the Court notes that under the present provisions of defendant's pension plaintiff will continue to receive a portion of said pension in the event of his death. It is ordered that this presently existing pension be in no way modified by the defendant in the future and that the plaintiff shall at all times continue to maintain her residuary interest in said pension.
The parties shall annually, commencing April 15, 1995 and continuing while said order is in effect, exchange federal income tax returns.
VII. Other Orders
A. Life Insurance
Defendant shall maintain a life insurance policy in the minimum face amount of $50,000 with plaintiff as irrevocable beneficiary during such time as defendant shall be required to pay alimony to the plaintiff.
B. Health Insurance
Defendant shall permit plaintiff to have COBRA coverage on his existing policy for the maximum period prescribed by law at plaintiff's sole cost and expense.
C. Attorney's Fees
In view of the previous orders of the Court, no award of attorney's fees is made to either party.
D. Liabilities
Each of the parties shall be solely responsible for all liabilities listed on his or her financial affidavit CT Page 8126 and shall hold the other party harmless in that regard.
By the Court
John D. Brennan State Judge Referee